This is an action to set aside certain deeds made by W. E. B. Harris to his daughter, Mattie D. Harris, defendant in this action, in fraud of creditors. W. E. B. Harris was a resident of Warren County, N.C. and died in that county in April, 1936.
Among the assets of the estate of S. H. (Hunter) Satterwhite coming into the hands of the executors, plaintiffs in this action, was a note for $5,000, signed by R. A. Harris and W. H. Harris, and endorsed by L. J. Harris, L. R. Harris, and W. E. B. Harris. Said note bearing date of 24 September, 1925, and payable on demand after date with six per cent interest. That said note has been credited with the following payments: 20 February, 1928, $36.00; 1 January, 1929, $900.00.
The testator of plaintiffs lived in Vance County and the plaintiffs recovered judgment on said note in Vance County, on 8 February, 1932, for $5,943.74, with interest from 1 December, 1931, and costs. This judgment was docketed in Warren County, N.C. At the time the note was endorsed by W. E. B. Harris, he had considerable real estate in Warren County, same being heavily mortgaged. The land of W. E. B. Harris was purchased by defendant, Mattie D. Harris. She was sworn as a witness for plaintiffs and testified, in part:
"The property I owned in 1926 was a note of my father's for $1,000 and Ihad some money. I had a deed of trust as security for my father's note on 65 acres of land, my grandfather's old place. I really do not know how to estimate that money I had at that time; I had it loaned out to my father and brothers . . . . I am the daughter of Mr. W. E. B. Harris. I did nothave any knowledge of his debts in January and February, 1927; I did not know he was in debt or not. Yes, I knew he was in debt when I got that deedreciting certain debts. It was right much of a surprise any more than the Land Bank. I did not know until he told me that he had two indebtednesses.When he transferred me the property he told me there were two debts, the Land Bank mortgage and the Phelps and Coleman notes, rather it was Mrs. Phelps and Mr. Coleman was her guardian. I don't remember the date I first knew my father was liable to Mr. Satterwhite on a note for my brother. My brother's wife, Mr. Satterwhite's daughter, came to my home one day, I do not remember when it was, and asked me would I endorse the note. I did not know it then only what she told me. I reckon she knew he endorsed it, or thought he endorsed it. I got the deed to the property before she came to my home and told me that, I got the deed for the property in 1927; I had the deed to the property but had not paid it off. . . . I think I borrowed the money from the Bank of Warren to furnish the men who cultivated the land that year. I had some money *Page 368 
to begin with and what I did not have I borrowed from the Bank of Warren and bought fertilizer, and traded on time and got through all right. I had some credit. I can't tell you what was the cost of operating a farm of that size with thirty acres of tobacco. It was different for different years, depending on the seasons, and as near as I can remember I made right good in 1927. . . . I did right well in 1928 and 1929, too. I did not have as much as $3,000 left those years after paying my indebtedness. I never kept my record of what I had left after paying the indebtedness of the crop for the current year. I knew just about what I done with the money; I knew I did not have to keep any record. I don't remember about 1930, but I made pretty good in 1932, and I think I have some of the sales over here. I did not know I did as well until the other year. . . . I don't think I had more than $500.00 or something like that when I paid my father the $400.00 in February, 1927. I listed for taxation in 1927, as you will see from the book, but I did not list anything prior to 1927. My father listed before then. As to whether I had any property except the $400.00 I paid my father and the $1,000 note, I had been growing a little piece of tobacco every year. One year it brought me $450.00, and another year a little over $700.00. I had a little crop all along and tried to beat my brothers. I hada little bank account and if they wanted it, I let them have it, let themborrow it. After 1927 my father stayed right on in the same home until he died. He deeded the land to me in 1927 and died in 1936. He did not give the same direction to the farm after he deeded it to me in 1927 that he did prior to that time. He became disabled and did not have to do anything. He rode the pony whenever he wanted to, but he did not direct the farm. If he wanted to go to a tobacco sale he went, just the same as he rode the pony if he wanted to do so. I looked after the selling of the tobacco. He looked after the selling in 1927 but the tobacco was put in the name of Harris and my tenants, and I sold some. Other tobacco than the little piece I had each year was sold in my name and everybody knew it was my tobacco. . . . I don't know how many acres of land I have bought since 1927. It is somewhere around 1,000 acres I have, and might be more. I have not figured it up, but I expect it is more. The biggest that it cost me was the Land Bank debt and the Coleman debt. About the new land I have bought, I paid $3,000 for the Lickskillet place, and bought a little piece down by the railroad that cost me some over $500.00. Then there was another little piece I got from Mr. Thornton. Most of the money I used to buy this other land was made on the farm I got from my father. I have made some on some of the other but not very much. The most of the money I have invested in land in the last ten years has been made from this farm. . . . The money that was paid the *Page 369 
Federal Land Bank was made on this farm, and the money paid to Mr. Coleman was made on this farm. I had $900.00 worth of lumber cut that came off of this farm, too. . . . I have not invested very much money in land and other agencies since 1927 beside what I have invested in my home place. Besidethe Land Bank and the Coleman note, I had to pay the Bank of Warren a deedof trust I did not know was there, but for the payment to the bank I gotback a piece of land that had been pledged there by my father. I own that deed of trust now. I have never had any of the papers canceled that I bought of the debts of my father; just have them like they were and still own them in that form. My object in doing that was because I did not know what would take place and thought I would just keep them. I have heard my father had some other debts but I did not know it. I thought it might be a good idea to have a connecting link between me; I did not worry about it. I don't know that the deed was put in this form so that creditors would let me and my father alone; but there were some others of the family and Iworked with my own hard labor and kept looking after him, and took care ofthis and felt like it was mine, and therefore, would not have any disturbance over it. My father did not continue to give me the same assistance about the farm that he had in previous years. I looked after itmyself, and it was well known throughout the county. . . . A lot of people in the community said I managed the farm better than it had been managed in years. My father had to rest during the middle of the day. He would ride over to his brother's and go to Macon, come back and sleep until lunch, and if he wanted to get exercise he would. He did not take any of his furnishings or living expenses out of the income from the farm. He had the income from a war risk insurance policy on his son to do anything he wanted to with. I did not find out my father owed Mr. Satterwhite any money. Ihave never known he owed him any. I was told he endorsed a note. Mrs. Harris, his daughter, told me he endorsed the note but I don't know what year. That is what I understood her to say, that my father and brother endorsed a note. I still say it was at least 1930 before I found out my father had endorsed this note to Mr. Satterwhite. My father never talked business but very little with me. I did not ask my father to make this deedto me. He asked would I take it and told me about the two debts owing onit, and I told him to have a home for him in his old age I would try. I don't know whether my father had property after deeding this to me, sufficient and available to pay his debts other than those I have mentioned or not. I don't know what he had. I was just trying to make my own debt. I know he had some land after he conveyed this to me, but I don't know how much. I could not tell whether that land was sufficient to pay theSatterwhite debt or not. It *Page 370 was valued at more than enough when he bought it, and I reckon he put moremoney in it than enough to pay the debt. This land that I have reference to was sold because he never was able to finish paying for it; that is what I think. I don't remember whether he had any land that was not mortgaged after he conveyed this property to me. I did not find any property that he owned after he died that was sufficient to have an administrator appointed for."
On cross-examination: "I am the only daughter of W. E. B. Harris, deceased. He was in his 81st year when he died, and he made me thisconveyance when he was about 70 years old. The first year I took charge of the farm my father gave me a little advice, but he did not have anything to do — no more than what he wanted. If he wanted to do some little thing he would, but I don't remember him doing anything that counted for anything . . . . I do not remember what year my father bought the Brownland. He was supposed to pay around $20,000 for it. I am sure that was soldto pay the balance that was due on it. I never have worked the interest that was due on the two mortgages on the land that I assumed. I have some checks that I paid until I paid the mortgage in full. I paid installments of $210.00 twice a year, and then paid $4,900 and some dollars; I never have worked them out. I imagine they ran around $12,000 on the two places,with interest. . . . I imagine the $12,400 that I paid for the tract ofland was more than it was worth. The Land Bank loaned $6,000 on it, and they had the first mortgage. There was a debt of $1,000 on the 65-acre tract when my father deeded this tract to me; there was no interest due on it at the time. I reckon there had been some interest worked on up because nothing had been paid on it. I reckon the interest and principal was $1,200 or $1,250. That was full value for the land and no one else would ever havepaid that for it. It is way back off the road. I have a separate deed to that place. The reason he deeded it to me was like I said, he owed me some money; I had a note or check. I took the deed for what he owed me, and my brothers owed me some money, too. I had let them have money that I did not need. My father asked me if a deed to that place would satisfy me, and Itook the deed in settlement of about $1,250 for the money that was owing meon the note. I think I paid full market value for all the property I gotfrom my father, W. E. B. Harris. I would not like to pay it again . . . . I did not know anything about the suit that the administrators of Mr. Satterwhite in Vance County had brought against my brother and father. I did not know anything about the note until Mrs. Harris told me. If my father ever owed Mr. Satterwhite a penny in his life I did not know it. . . . I paid the Land Bank in semiannual installments until I paid the amount in full, the installments being $210.00 each. . . . *Page 371 
During the time I was paying the installments to the Land Bank I was farming the land deeded to me by my father. I farmed the land and was paying the debts off. I can't remember the full amount that my income averaged for the ten years after this land was deeded to me, but I imagine it averaged in the neighborhood of $3,000 per year though I never have checked back. Out of that I paid the interest payments and the $4,900 on the Land Bank debt; and also whatever I paid on the Coleman mortgage, which may have been $4,900 or less, according to the checks I have here. The 65-acre tract never was deeded to me but the one time and before that I just held a note and deed of trust on it. . . . My father told me in 1927he was going to have the deed made to me for the note; he had it donehimself. Of course there was a note and never was nothing done to it, and nobody ever gave it to anyone. I did not have the note and deed of trust canceled; nobody was coming to claim it and if they did I would have the note to show. I did not know whether the deed was all right, or I would have to put the land up and sell it under the deed of trust. I knew the deed to the home place was all right, or I thought it was all right. I have kept the Land Bank mortgage and the Phelps mortgage uncanceled ever since.I thought the land was not worth no more than that; those first mortgageswere satisfactory to me. It is true I paid off the mortgages from money made on the land, and they have not been canceled. . . . Since I have hadcharge of the farm I have had to make right much improvement. The buildingshad gotten right much dilapidated. I have added a room to the home place,put on a new top, and some new flooring. The improvements I have made on the place came from the earnings from the farm."
T. B. Gardiner, a witness for plaintiff, on cross-examination, testified, in part: "In the year 1927, the year Miss Mattie Harris bought this land, she listed $7,495 in Six Pound Township and $2,775 in Judkins Township. I know that the value is put upon land by the assessors; about $10,000 is the value the assessors put upon the land she bought. The amounts listed for taxation do not show the amount of mortgages there was upon the land at the time Miss Harris bought it . . . During the years 1933, 1934, 1935, 1936 and 1937 W. E. B. Harris did not list anything in Six Pound, Judkins, or Warrenton Townships."
W. E. Twitty estimated the land value at $50.00 an acre. On cross-examination he testified: "I have been all over Mr. Harris' land and just knew it was his land, but did not know the boundaries of the different tracts; I have hunted on the land and I thought I knew it to be his land, land I have always known as Mr. Harris' land. I do not know anything about the lines, but as I said, I have hunted on the land, and when riding along the road saw his home, garden and the improved property around the home." *Page 372 
A. A. Bunn, one of the plaintiffs, testified that he was an executor of the estate of S. H. Satterwhite; that he made no investigation from 1929 (the time of his qualification) to 1932, to find out whether the Harris note was good; that what information he got would be through Mr. Henry Satterwhite, his co-executor; that it is true that he did file a report in 1932, in which he said note was doubtful; that it is true that Warrenton is 20 miles from Henderson, and that as he had stated before in his testimony, he never made any investigation; that his co-executor, Henry Satterwhite, was his sole informant of whatever transactions had taken place with respect to the W. E. B. Harris property.
The plaintiffs offered no evidence to the effect that the plaintiffs' testator, S. H. Satterwhite, did not know at the time of his death in 1929, of the existence of these deeds from W. E. B. Harris to his daughter, Mattie D. Harris, the defendant in this action. J. Henry Satterwhite,co-executor of S. H. Satterwhite, was present through the trial, seatedbehind and advising with the plaintiffs' counsel, but was not sworn ortendered as a witness by the plaintiffs.
At the close of plaintiffs' evidence, on motion of defendant for judgment as in case of nonsuit, C. S., 567, the court below granted the motion. Plaintiffs excepted, assigned error, and appealed to the Supreme Court.
We think from the evidence in this action, the nonsuit was properly granted. There are several defenses, but we think it only necessary to consider one. In the complaint the plaintiff alleges that "Upon information and belief that the conveyance of real property and transfer of personal property was contrived and devised of fraud and that the fraud was well known to this defendant and that such transfers were without consideration, and the defendant took and accepted the conveyance and transfer with the intent and purpose of defrauding the late Hunter Satterwhite."
Defendant in her answer denies the allegations of the complaint, and says: "The said W. E. B. Harris did not make any gifts to or voluntary settlement upon the defendant of the property hereinbefore referred to, but, on the contrary, this defendant paid more than full value therefor, and the statement in said paragraph that a fraudulent act was committed by her said father and participated in by this defendant is wholly untrue."
In the case of Aman v. Walker, 165 N.C. 224 (227), the 4th principle adduced from the authorities is as follows: "If the conveyance is *Page 373 
upon a valuable consideration and made with the actual intent to defraudcreditors upon the part of the grantor alone, not participated in by thegrantee and of which intent he had no notice, it is valid."
The defendant was plaintiffs' witness; they vouched for her integrity and are "not at liberty directly to assail his reputation for truth and thus destroy his credit before the triers." Smith, C. J., in Strudwick v.Brodnax, 83 N.C. 401 (402-03). Defendant testified: "I did not ask my father to make this deed to me. He asked would I take it and told me about the two debts owing on it, and I told him to have a home for him in his old age I would try." When the deed was made to her, she knew nothing about her father's endorsing the Satterwhite note with others. She testified: "I imagine the $12,400 that I paid for the tract of land was more than it was worth. . . . I think I paid full market value for all the property I got from my father, W. E. B. Harris. I would not like to pay it again." She knew nothing about the suit in Vance County brought against her father and others as endorsers; she lived in Warren County.
The tax list is hearsay evidence and incompetent. If competent, it has no sufficient probative force to go beyond the scintilla rule, nor has the other evidence in the case.
In Hamilton v. R. R., 150 N.C. 193 (194), it is decided: "Under our revenue law the owner of land does not, in listing it for taxation, fix any value upon it. This is done by the assessors, `either from actual view or from the best information that they can practically obtain, according to its true valuation in money.' Revisal, sec. 5203 (N.C. Code, 1935 [Michie], sec. 7971 [21]). We cannot see, therefore, how the fact that the witness `listed the land for taxation has any tendency to show its value or his opinion in that respect. The valuation is, as said by the Court inRidley v. R. R., 124 N.C. 37, res inter alios acta. R. R. v. Land Co.,137 N.C. 330. We are content to rest our decision upon what is said in these cases. The objection is not that tax lists are not public records, but in the valuation of the land for taxation the owner is not consulted — he takes no part. The valuation is but the opinion, upon oath, it is true, of the assessors, for the purpose of taxation. It is well understood that it is the custom of the assessors to fix a uniform rather than an actual valuation. In any aspect of the question, we concur with his Honor's ruling, both upon authority and the reason of the thing."Peterson v. Power Co., 183 N.C. 243 (247); American State Bank v. Geo. W.Butts et al., 111 Wn. 612, 191 P. 754; 17 A.L.R., p. 168.
The action is similar in many respects to that of Bank v. Finch,202 N.C. 291 (296). A verdict must rest upon substantial evidence, not upon mere surmise, speculation, conjecture, or suspicion. The conveyance was for a valuable consideration. When made to defendant she *Page 374 
was unaware of this security debt of her father. To set aside this conveyance on the facts in this case would be unjust and inequitable. From the testimony, she paid full value for the property and supported her aged father for some 10 years. If her father had the actual intent to defraud his creditors, there is no evidence that this defendant had any notice or participated in the fraudulent intent.
The evidence shows that W. E. B. Harris was an old man, about 70 years of age, in declining health. He owned valuable plantations in Warren County, N.C. but they were heavily mortgaged. He had a daughter living with him, the defendant in this action. She had saved up a little money and at the suggestion of her father she paid him the sum of $400.00 and he made a deed to her for the property with the agreement that the two mortgages should be paid off by her. Another piece of land was sold her by her father for the debt on it. Another piece was heavily mortgaged and was sold to pay the balance due on it — this was known as the "Brown land." Defendant was able, by her heroic efforts, to manage the farms with such skill and ability that she took care of her father in his old age for 10 years, until he was 81 years old, when he died. She testified that she paid full value for all the land deeded to her by her father and the deeds were duly recorded. She knew nothing about his owning any debts when he voluntarily sold her the land, except the mortgages which she paid off, amounting to $12,400 and interest. After taking care of her father and sacrificing years and years of her life to pay the indebtedness on the farms so that they might have a home, she is suddenly confronted with an old endorsement debt of some 10 years standing, of which she had no knowledge or notice. It will be noted that the heirs at law are not trying to upset the deeds. The record indicates a remarkable achievement in industry by a woman — supporting her aged father and so successfully managing the farms during a period when the larger part of profits from agriculture were deflated in this State.
The value of the land assessed for taxes is hearsay evidence and incompetent — it has no probative force in a court of law, equity or justice. There was no sufficient evidence to support plaintiff's claims. We might say, from the record, that defendant performed her full duty in that state of life in which it has pleased Almighty God to call her.
The judgment of the court below is
Affirmed. *Page 375